PRESENT: Koontz, Kinser, Lemons, and Mims, JJ., and Lacy and
Russell, S.JJ.

DAVID M. A. PARISH,
ADMINISTRATOR OF THE ESTATE
OF EUGENE NEAL PARISH

v.  Record No. 092279                          OPINION BY
                                        JUSTICE WILLIAM C. MIMS
DIANE E. PARISH, ET AL.                      January 13, 2011

          FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                    Norman A. Thomas, Judge

     In this appeal of a will contest, we consider whether the

circuit court properly found that the decedent, an "incompetent"

person with appointed conservators, had testamentary capacity,

and whether the circuit court properly held there was no

presumption of undue influence when a major beneficiary of the

will also was the decedent's conservator and acted as the

decedent's translator during the drafting of the will.

                           BACKGROUND

     The decedent, Eugene Neal Parish ("Eugene"), suffered a

head and spinal cord injury in 1982 due to being struck in the

head with a metal pipe while at a bar.  The injury left him

paralyzed in his legs and right arm.  Eugene sued the bar and

the person who attacked him and recovered $3.5 million.  At the

time of his injury, Eugene's only child, David M. Parish

("David"), was eleven months old.

1

In 1983, Eugene was declared incompetent in Florida due to encephalopathy.[1]  His wife was appointed as guardian.  For the court to make such an appointment, Eugene had to be shown "incapable of caring for himself or managing his property or . . . likely to dissipate or lose his property or inflict harm on himself or others."  Former Fla. Stat. § 744.331 (as in effect prior to amendment by 1989 Fla. Laws ch. 89-96, § 35).[2]  Later, Eugene's mother assumed the duties as his guardian.

In 1989, Eugene moved to Tennessee and resided at a nursing facility near Memphis.  David Wayne Parish ("David Wayne"), Eugene's brother, lived approximately 40 to 50 miles from Eugene's nursing facility.  Diane E. Parish ("Diane") and David Wayne were married in 1998.  Eugene's mother, who had acted as his conservator, remained in Florida.  She agreed to transfer the conservatorship to David Wayne and Diane in Tennessee.

---

[1] Encephalopathy is "[g]eneralized brain dysfunction marked by varying degrees of impairment of speech, cognition, orientation, and arousal.  In mild instances, brain dysfunction may be evident only during specialized neuropsychiatric testing; in severe instances, . . . the patient may be unresponsive even to unpleasant stimuli."  Taber's Cyclopedic Medical Dictionary 761 (21st ed. 2009).

[2] The order of the Florida court cites former Fla. Stat. § 744.31(7), the provisions of which were repealed in 1974 and subsequently incorporated into the version of Fla. Stat. § 744.331 in effect in 1983.  See 1974 Fla. Laws ch. 74-106, §§ 1, 3 (repealing former Fla. Stat. § 744.31 and enacting former Fla. Stat. § 744.310, a predecessor of current Fla. Stat. § 744.331), and 1975 Fla. Laws ch. 75-222, §§ 9, 26 (enacting Former Fla. Stat. § 744.3101, a predecessor of current Fla. Stat. § 744.331).

In 2000, David Wayne and Diane petitioned to be appointed as Eugene's co-conservators in Tennessee. They described the reason for the appointment as Eugene's encephalopathy. Tennessee law required that David Wayne and Diane show that Eugene was a "[d]isabled person," which "means any person eighteen (18) years of age or older determined by the court to be in need of partial or full supervision, protection and assistance by reason of mental illness, physical illness or injury, developmental disability or other mental or physical incapacity." Tenn. Code Ann. § 34-1-101(7). The Tennessee court granted the petition, and David Wayne and Diane became Eugene's conservators.

In the fall of 2002, David Wayne assisted Eugene in preparing a Last Will and Testament (the "will"). David Wayne testified at trial that Eugene had informed him "out of the blue" that he wanted a will. During Eugene's meeting with the paralegal who drafted the will, David Wayne acted as a translator because Eugene, who spoke through a voice box due to a tracheotomy, was difficult to understand. David Wayne was present in the room with the witnesses and the notary when the will was executed and witnessed on October 2, 2002.

In the will, Eugene bequeathed 25% of his estate to David Wayne, 25% to Diane, 25% to David, and 25% to other family

3

members.[3]  Eugene's will appointed David Wayne as executor and Diane as substitute executor.  Neither David Wayne nor Diane informed David that Eugene had executed a will.

In 2003, David Wayne and Diane executed a statement of fiduciary in the probate court of Tennessee "to demonstrate to the court the need, or lack of need, for the continuation of the fiduciary's services."  The statement averred that Eugene continued to need conservators because his "condition remains [the] same – encephalopathy."

In 2004 David Wayne and Diane requested that David and his wife Jessika Parish ("Jessika") take over as conservators and guardians of Eugene.  David and Jessika, who lived in Virginia Beach, petitioned the local circuit court in Virginia to adjudicate Eugene incompetent and appoint them as guardians and conservators.  The circuit court appointed a guardian ad litem ("GAL"), who reported that Eugene required a guardian and conservator.

Specifically, the GAL reported that Eugene "had difficulty speaking but was communicative and obviously could understand your guardian ad litem's questions and was able to respond."  In response to one of the GAL's questions, Eugene "indicated that he was aware of the guardian/conservator proceeding, and even

_____

[3] In the absence of a will, Eugene's entire estate would pass to his son David under Virginia's law of intestacy. Code

4

pointed out that his son's name was incorrect in the original Petition."  The GAL further stated that Eugene's "understanding of his finances, however, seemed to be somewhat impaired in that he indicated that he presently had $3.5 million in the bank, obviously not recognizing the fact that his funds have been expended over the last twenty years in caring for him."

The Virginia circuit court granted the petition.  The 2004 order appointing a temporary conservator found that Eugene "is incapacitated to such an extent that he is unable to care for himself, make medical decisions, manage his estate or understand his debts as they come due."

Eugene died in 2006.  David qualified as his administrator. Diane then petitioned the circuit court to have David removed as administrator and herself appointed as executor pursuant to Eugene's will.[4]  David filed a counterclaim to impeach the will. David claimed that Eugene lacked testamentary capacity to execute a will due to encephalopathy.  He further claimed that David Wayne and Diane subjected Eugene to undue influence.  At trial, the court found that Diane had proved by clear and convincing evidence that Eugene had testamentary capacity, and that Eugene was not subjected to undue influence.

---

§ 64.1-1.

[4] Diane averred that David Wayne had declined to serve as executor.

David assigns error to the circuit court's judgment as follows:

(1) The trial court erred in holding that the decedent had testamentary capacity to execute his Last Will and Testament because when a person is adjudicated mentally incompetent, it is prima facie evidence of their testamentary incapacity, and in order to overcome a presumption of testamentary incapacity, the burden is on the proponent of the will to show by clear and convincing evidence that testamentary capacity existed at the time the will was drawn and executed, which petitioner failed to do.

(2) The trial court erred in holding that the decedent was not subject to undue influence because a presumption of fraud was created when the conservators, during their time of service to decedent, assisted decedent in the execution of his will and were made major beneficiaries in that will, and petitioner failed to overcome that presumption.

DISCUSSION

A. EFFECT OF ADJUDICATIONS OF INCOMPETENCE

Relying on Western State Hospital v. Wininger, 196 Va. 300, 83 S.E.2d 446 (1954), David assigns error to the circuit court's ruling that Eugene's adjudications of incompetence did not invoke a presumption that he lacked capacity. In Western State, we required clear and convincing proof of capacity to overcome a presumption of insanity when the testator previously was adjudicated insane. Id. at 311-12, 83 S.E.2d at 452-53.

However, we previously have held that "the mere fact that one is under a guardianship does not deprive him of the power to make a will." Gilmer v. Brown, 186 Va. 630, 637, 44 S.E.2d 16,

6

19 (1947).  See also Gibbs v. Gibbs, 239 Va. 197, 202, 387

S.E.2d 499, 502 (1990) ("the appointment of a guardian cannot be

regarded as prima facie evidence of mental incapacity").

In Gilmer, we explained:

> Mental weakness is not inconsistent with testamentary capacity.  A less degree of capacity is requisite for the execution of a will than for the execution of contracts and the transaction of ordinary business.  One may be capable of making a will yet incapable of disposing of his property by contract or of managing his estate.  Mental strength to compete with an antagonist and understanding to protect his own interest are essential in the transaction of ordinary business, while it is sufficient for the making of a will that the testator understands the business in which he is engaged, his property, the natural objects of his bounty, and the disposition he desires to make of his property.  The condition of being unable, by reason of weakness of mind, to manage and care for an estate, is not inconsistent with capacity to make a will.

186 Va. at 637, 44 S.E.2d at 19 (internal citations and

quotations omitted).  In Thomason v. Carlton, 221 Va. 845, 276

S.E.2d 171 (1981), we revisited this issue:

> Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid.  If at the time of its execution the testatrix was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property, that is sufficient.

Id. at 852, 276 S.E.2d at 175 (internal quotation marks and

citations omitted).

The mere fact that one is under a conservatorship is not an adjudication of insanity and does not create a presumption of incapacity.  The conservator statutes at issue here are instructive.  Florida law required that Eugene be shown "incapable of caring for himself or managing his property or . . . likely to dissipate or lose his property or inflict harm on himself or others."  Former Fla. Stat. § 744.331 (as in effect prior to amendment by 1989 Fla. Laws ch. 89-96, § 35).  Similarly, Tennessee law required a showing that Eugene was "in need of partial or full supervision, protection and assistance by reason of mental illness, physical illness or injury, developmental disability or other mental or physical incapacity."  Tenn. Code Ann. § 34-1-101(7).  Virginia's statute requires showing that the respondent is "incapable of receiving and evaluating information effectively . . . to such an extent that the individual lacks the capacity to . . . manage property or financial affairs or provide for his support . . . without the assistance or protection of a conservator."  Code § 37.2-1000.

None of these statutes required a specific factual finding that Eugene was incompetent to such an extent that he could not execute a will under the standard we articulated in Gilmer and Thomason.  Accordingly, the circuit court correctly ruled that Eugene's adjudications of incompetence due to encephalopathy and

8

the attendant appointments of conservators did not create a presumption of incapacity.

### B. CAPACITY

In the absence of a presumption of incapacity, "[t]he proponent of the will bears the burden of proving the existence of testamentary capacity by a preponderance of evidence and retains that burden throughout the proceeding." Gibbs, 239 Va. at 199, 387 S.E.2d at 500.[5]  In Gibbs, we further explained that

> the proponent of the will is entitled to a presumption that testamentary capacity existed by proving compliance with all statutory requirements for the valid execution of the will. Once the presumption exists, the contestant then bears the burden of going forward with evidence to overcome this presumption, although the burden of persuasion remains with the proponent.

Id. at 200, 387 S.E.2d at 501.  To overcome the presumption of capacity, we do not require clear and convincing proof; rather "the contestants need only go forward with evidence sufficient to rebut the presumption." Id. at 201, 387 S.E.2d at 501.

David does not dispute that the will was duly executed according to Tennessee law; consequently the presumption of

---

[5] Though the will was executed in Tennessee, we apply Virginia law to determine testamentary capacity. Poole v. Perkins, 126 Va. 331, 336, 101 S.E. 240, 242 (1919) (recognizing exception to Virginia's lex loci rule for issue of capacity). See also Rochester v. Rochester Corp., 316 F. Supp. 139, 140 (E.D. Va. 1970), rev'd on other grounds, 450 F.2d 118 (4th Cir. 1971); Restatement (Second) of Conflicts §§ 239(d), 244(h) (1971).

testamentary capacity applies and the burden of producing evidence shifted to David, the contestant of the will.

David testified that Eugene mistook him for David Wayne during a visit in December 2002. Eugene told David that he had a sister, but "[i]t was one of those things where he would send 29 cents a day to like Somalia or something like that. . . . He thought he had adopted a kid." Eugene constantly forgot things, and had short-term memory problems. They had discussions about a trust fund, when actually there was no such trust.

Jessika also testified that during the December 2002 visit Eugene mistook David for David Wayne. David had to explain "that he was little David all grown up." She described Eugene as "not all there." She described his difficulty comprehending the value of money: "[A]t Christmas time, when he was in the nursing home, he wanted to buy every employee at the nursing home either a fur coat or car, and almost couldn't be talked down from the idea."

David also presented the expert testimony of Dr. Eric Goldberg, a board certified neurologist who treated Eugene on three occasions from November 2004 through June 2005. Dr. Goldberg testified that the condition of a person with a traumatic brain injury, such as that suffered by Eugene, is "static," becoming neither better nor worse over time. He testified that Eugene "could follow a two-part command," that he

"was not oriented to person, place or time," and that he had "no short term-memory." In Dr. Goldberg's opinion, Eugene was not able to understand and know the value of his estate or to remember all of his family members. He concluded that Eugene easily could be influenced and was not competent to execute a will.

We will assume without deciding that the testimony of David, Jessika, and Dr. Goldberg was sufficient to overcome the presumption of capacity. Therefore, the burden to produce evidence of capacity shifted back to David Wayne, the proponent of the will. Gibbs, 239 Va. at 200, 387 S.E.2d at 501.

"[I]t is the time of execution of the will that is the critical time for determining testamentary capacity." Thomason, 221 Va. at 853, 276 S.E.2d at 175. "[T]he testimony of those present at the factum – when the will is executed – is entitled to the greatest consideration." Id. "[I]n determining the mental capacity of a testator, great weight is to be attached to the testimony of the draftsman of the will, of the attesting witnesses, and of attending physicians." Hall v. Hall, 181 Va. 67, 76, 23 S.E.2d 810, 814 (1943).

Leonard Kyles was the paralegal who assisted Eugene in drafting the will and was a witness to its execution. Kyles testified that he was satisfied that Eugene knew what he was doing when he signed the will. Cheryl Campbell witnessed the

11

execution of the will to notarize Eugene's signature. She testified that Eugene, when asked what the document was, replied it was his last will and testament. Eugene did not do or say anything to cause her concern as to his understanding of what was happening.

Dr. Elbert Hines, Eugene's treating physician at the nursing facility in Tennessee, testified that he saw Eugene at least once every 60 days, beginning in the fall of 2000. He assessed Eugene in September 2002 and testified with a reasonable degree of medical probability that Eugene was not confused in any way, that he knew what it was he was doing and who his relatives were at that time. Dr. Hines saw Eugene again in October and December 2002, and testified that he was alert and oriented to self and place and that he had not deteriorated since the September visit. Dr. Hines concluded with a reasonable degree of medical probability that Eugene could understand what property he owned and to whom he was giving it.

Additionally, David Wayne testified that on the day he took Eugene to sign his will, his mental condition was "just regular[,] just a regular guy." He further testified that Eugene was not confused and that he knew who all his family members were. Diane testified that Eugene's mental condition "was great," and that she conversed with him about family, politics, and baseball. Arnold Lindseth, Eugene's attorney in

12

the Tennessee conservatorship, testified that in January 2003 he spent approximately two hours with Eugene at a bank setting up accounts and Eugene "seemed lucid [the] whole time" and "aware of what was going on."

Catherine Logan was Eugene's social worker at the nursing facility. She testified that Eugene understood who he was and who his relatives were. She testified that he suffered no cognitive impairment, "just short-term memory [problems]." However, she did testify that Eugene, who enjoyed feeding the pigeons outside the facility, sometimes thought he was feeding pigeons when he actually was feeding rats. Additionally, she stated that on the day Eugene signed the will he told her he was leaving half of his estate to "Little David," his son, when in fact he left only 25% to him.

We review the circuit court's finding of capacity for sufficient evidence. Eason v. Eason, 203 Va. 246, 253, 123 S.E.2d 361, 366 (1962) ("where the case has been fairly presented and there is credible evidence to support the conclusion" of the fact-finder, this court will not disturb the verdict); Gilmer, 186 Va. at 642, 44 S.E.2d at 21 (trial court's approval of a commissioner's report on testator's capacity "should not be disturbed unless its conclusions are at variance with the evidence").

This evidence is sufficient to support the circuit court's ruling that Diane proved Eugene's testamentary capacity.[6] Consequently we affirm the circuit court on that issue.

## C. UNDUE INFLUENCE

We now turn to David's claim that the circuit court erred in finding that David Wayne and Diane did not exercise undue influence over Eugene. It has long been the general rule that "suspicious circumstances place a burden upon the proponents of a will to make a satisfactory explanation." Barnes v. Bess, 171 Va. 1, 8, 197 S.E. 403, 405 (1938).

In Martin v. Phillips, 235 Va. 523, 369 S.E.2d 397 (1988), we observed that in the will context "a presumption of undue influence arises when three elements are established: (1) the testator was old when his will was established; (2) he named a beneficiary who stood in a relationship of confidence or dependence; and (3) he previously had expressed an intention to make a contrary disposition of his property." Id. at 527, 369 S.E.2d at 399.[7]

---

[6] The circuit court ruled that that Diane proved Eugene's testamentary capacity by clear and convincing evidence. However, only a preponderance of the evidence was required. Gibbs, 239 Va. at 199, 387 S.E.2d at 500.

[7] With respect to the issue of undue influence in the execution of deeds or leases, see Friendly Ice Cream Corp. v. Beckner, 268 Va. 23, 33, 597 S.E.2d 34, 39 (2004) (overruling Martin in part on that issue and setting forth the alternative standards governing undue influence determinations relating to execution of deeds and leases).

The factors discussed in Martin regarding persons of advanced age are equally applicable to other testators who have weakness of mind, whether from injury as in this case or from any other cause. We hold that when a person with such weakness of mind has named a beneficiary with whom the testator stood in a relationship of confidence or dependence, and when the testator either previously had expressed a contrary intention or previously had expressed no intention regarding the disposition of his property, a presumption of undue influence arises.

Our prior decisions contemplated undue influence in the context of elderly testators, not of young victims of brain injuries. E.g., Hartman v. Strickler, 82 Va. 225, 238 (1886) ("Where a will executed by an old man differs from his previously expressed intentions, and is made in favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of fraud and undue influence.") (emphasis added); Whitelaw v. Sims, 90 Va. 588, 589, 19 S.E. 113, 113 (1894) ("old person"); Culpepper v. Robie, 155 Va. 64, 87, 154 S.E. 687, 696 (1930) (" 'old man' ") (quoting Hartman, 82 Va. at 237). Such a requirement is too restrictive in this case, since Eugene was 22 years old at the time of his severe brain injury and 41 when he executed his first and only will. Likewise a "contrary expression" regarding disposition of property would be highly unusual at age 22. The record in this

15

case does not demonstrate that Eugene even had significant property until after his brain injury. We therefore hold that the age and contrary disposition requirements discussed in Martin are inappropriate in determining whether Eugene was unduly influenced by David Wayne, his conservator, his translator during the drafting of the will, and his major beneficiary who would have taken nothing had the estate passed by intestacy.

"Once the presumption of undue influence arises, the burden of producing evidence tending to rebut the presumption shifts to the opposing party." Martin, 235 Va. at 529, 369 S.E.2d at 400. Therefore, under the standards applicable in the present context, the burden of producing evidence to rebut the presumption of undue influence shifts to Diane. However, we note the following statements from the bench by the circuit judge:

> [E]ven if the Court were to apply an evidentiary presumption of undue influence against [Diane and David Wayne,] the . . . ultimate outcome of the case and the issue of clear and convincing evidence respecting the . . . intent of the testator, the ultimate outcome would be the same in this case, whether the Court applies the presumption or it doesn't.

The circuit court also noted there was "no evidence" of undue influence and there was evidence that "notwithstanding the impairments that he suffered, [Eugene] was a stubborn man. . . .

16

if he did not want to do something, he damn well knew how to resist."

These statements by the circuit court clearly indicate that if the presumption of undue influence in fact had been applied, the court as the fact-finder in this case would not have ruled differently.  In conclusion, the circuit court, after considering all the evidence and weighing the credibility of all the witnesses, found by clear and convincing evidence – a higher standard than required – that Eugene had sufficient testamentary intent and he was not subject to undue influence.  We will not disturb that finding upon appeal.

For the reasons stated, we affirm the judgment.

<u>Affirmed</u>.